# United States District Court
# for the District of Maryland
## Southern Division

| | |
|---|---|
| **BOARD OF EDUCATION OF MONTGOMERY COUNTY**, *et al.*, <br><br>       **Plaintiffs/Counter-defendants** <br><br>       **v.** <br><br> **JAMES PACI**, *et al.*, <br><br>       **Defendants/Counter-plaintiffs** | **Case No. 07-CV-02886-AW** |

### DEFENDANTS'/COUNTER-PLAINTIFFS' ANSWER AND COUNTERCLAIM

### ANSWER

#### First defense

The amended complaint fails to state a claim upon which relief may be granted.

#### Second defense

Defendants/counter-plaintiffs ("the Pacis") answer the specific allegations in the amended complaint as follows:

Allegation 1.   This Court has original jurisdiction pursuant to the Individuals with Disabilities [sic] Improvement Act [sic], 20 U.S.C. §§1400-1461 and 28 U.S.C. §§1331 and 1343.  Declaratory relief is authorized by 28 U.S.C. §§2201 and 2202. This Court has pendant jurisdiction pursuant to Md. Code Ann. Educational Article, §8-401 et seq. Plaintiffs have exhausted their state administrative remedies and appeal to this Court from a decision of an Administrative Law Judge of the Maryland State Office of Administrative Hearings ("the ALJ") acting on behalf of the Maryland State Department of Education, *James Paci v. Montgomery County Public Schools,* MSDE-MONT-OT-07-06179 (August 29, 2007) ("the ALJ Decision").

ANSWER:     Paragraph 1 of the amended complaint contains legal conclusions of the pleader to which no response is required.  To the extent a response is deemed required, the Pacis deny the allegations in that paragraph.  The Pacis specifically deny that declaratory relief is available to these plaintiffs or that plaintiffs have exhausted their administrative remedies.

Allegation 2.  The Board of Education of Montgomery County ("the School Board") is a local educational agency as defined by 20 U.S.C. §1401, which operates the Montgomery County Public Schools ("MPCS").

ANSWER:     Admitted.

Allegation 3.   James Paci ("the Student") is a child who resided in Montgomery County, Maryland.

ANSWER:     Admitted that James Paci ("James") resided in Montgomery County, Maryland at all relevant times.  Denied that James is a child.

Allegation 4.   Thomas Paci and Martha Donnelly ("the Parents") are the parents of the Student.

ANSWER:     Admitted.

Allegation 5.   The Student qualifies for special education services as a child with a code of Other Health Impairment as the result of a diagnosis of Attention Deficit Hyperactivity Disorder.

ANSWER:     Admitted that James has qualified for special education services with the indicated code.  Denied that the referenced code is the sole basis for providing special education services to him.

2

Allegation 6.   The Student attended the Blessed Sacrament School, a regular education, private school, from kindergarten through the sixth grade.

ANSWER:     Admitted that James attended the Blessed Sacrament School during the referenced school years, and that Blessed Sacrament was not certified as a special education school. The implication of ¶6–that James received no specialized services tailored to his needs–is denied.

Allegation 7.   He attended the McLean School, also a regular education, private school, for the seventh, eighth and ninth grades.

ANSWER:     Admitted that James attended the McLean School during the referenced school years, and that the McLean School was not certified as a special education school.  The implication of ¶7–that James received no specialized services tailored to his needs–is denied.

Allegation 8.   The Parents were committed to sending the Student to a regular education, private boarding school for tenth grade, the 2004-2005 school year.

ANSWER:     Denied.

Allegation 9. On February 12, 2004, Dr. Robert Chase, a Clinical Neuropsychologist, conducted a psycho-educational evaluation of the Student. The stated purpose of the evaluation was to help the Parents with the private school search and placement process.

ANSWER:     Admitted that Dr. Chase conducted a psycho-educational evaluation of James at the indicated time, which would have been used to help with school placement.  Denied that the sole purpose of the evaluation was as stated.

Allegation 10. It was only after the Student was rejected by the regular education, private boarding school, that the Parents sought to enroll him at his public home school, Walt Whitman High School ("Whitman"), which he attended for the 2004-2005 school year.

3

ANSWER:     Admitted that James was not formally enrolled at Whitman until after he was rejected by private schools his parents were considering.  Denied that this was the first time the Pacis "sought" to enroll him.

Allegation 11. Upon enrollment with the MCPS, the Student was evaluated to determine whether he should receive special education services. An IEP team conducted a screening meeting on August 17, 2004. The team obtained signed authorizations to obtain records and it discussed the Student's diagnosis of ADHD and the fact that this condition often results in social difficulties. At the end of the meeting, the Parents agreed to extend the time period for development of an initial IEP. A follow up meeting was scheduled for September, with the team gathering additional information in the interim.

ANSWER:     Admitted that following James's enrollment with MCPS, the school began the process of gathering information about him and determining his special education needs. Denied that the paragraph accurately characterizes the process with respect to promptness of MCPS's actions, thoroughness of information-gathering, discussions with the Pacis, or the Pacis' informed consent to MCPS's activities.

Allegation 12. Pending the evaluation of the Student's eligibility for special education services, he was scheduled to have four academic classes, a special education resource period, physical education, and Spanish 11.

ANSWER:     Admitted.

Allegation 13. On September 30, 2004, the Student was involved in a fight at Whitman for which he received an in-school suspension for two days.

ANSWER:     Admitted.

Allegation 14. On October 8, 2004, Judith Amick, school psychologist, reviewed Dr. Chase's evaluation of February 12, 2004, and she found this assessment to be appropriate for use by the MCPS in developing an IEP.

4

ANSWER:     Admitted that Ms. Amick's written comments about Dr. Chase's evaluation were dated October 8, 2004.  The date on which she reviewed Dr. Chase's evaluation is unknown.

Allegation 15. According to the written reports of his teachers, dated October 11, 2004, the Student was doing very well both academically and behaviorally at Whitman.

ANSWER:     Admitted that the teachers' reports to which the paragraph refers contained the referenced information regarding James's performance to date at Whitman.

Allegation 16. On October 12, 2004, an IEP meeting was held and the team determined that the Student was eligible for special education services based on a diagnosis of ADHD. The team developed an IEP wherein the Student was placed in the learning and academic disabilities ("LAD") program, being in special education classes 50% of the time and mainstream classes 50% of the time, all at his home school, Whitman. The IEP contained several behavioral, social and emotional goals and objectives dealing with following classroom routines.

ANSWER:     Admitted that an IEP meeting was held on October 12, 2004, that James was found eligible for special education services based on his diagnosis of ADHD, and that an IEP was developed which placed James in the learning and academic difficulties program, resulting in his spending 50% of his time in general education and 50% of his time in a special education setting. Defendants/counter-plaintiffs further acknowledge that the IEP contained goals in the identified subject areas.

Allegation 17. Beginning in January 2005, the Student was being treated by Dr. Nitin Gogtay, a Child, Adolescent and Adult Psychiatrist with the National Institutes of Mental Health, who prescribed psychotropic medication for the Student.

5

ANSWER:    Admitted that James began treatment with Dr. Nitin Gogtay in January 2005. Denied that the paragraph fully describes Dr. Gogtay's affiliations or the scope of James's treatment with Dr. Gogtay.

Allegation 18. According to the written reports of his teachers, dated January 26, 2005, the Student was doing very well both academically and behaviorally at Whitman.

ANSWER:    Admitted that the referenced reports contained some positive information regarding James's performance to date at Whitman.  The remaining allegations in the paragraph are denied.

Allegation 19. On February 17, 2005, the IEP team met for an annual review, to discuss extended school year and transitional services and to prepare an IEP for the following school year (2005-2006, 11th grade). Because of the Student's progress, both academically and behaviorally, the team determined that the Student would receive special education services in the regular classroom 100% of the time at Whitman and that he did not require extended school year ("ESY") services. Behavioral, social and emotional goals and objectives continued to be part of the IEP. The Parents believed that the Student was doing so well that he no longer required special education services.

ANSWER:    Admitted that the IEP team met on February 17, 2005 for the stated purpose, and that the meeting's outcome was an IEP that placed James in general education 100% of the time and did not provide extended school year services for him.  The remaining allegations in this paragraph are denied.

Allegation 20. On March 22, 2005, the Student, then a member of the Whitman crew team, was involved in an incident on the crew team's bus. The Student was searched and found to be in possession of marijuana and drug paraphernalia. As a result of this incident, the Student was arrested, suspended for ten days and, pursuant to the school's zero tolerance policy, precluded from participating on the crew team for one year.

6

ANSWER:     Admitted that James was arrested and disciplined following a search which found that he possessed prohibited items at school, and that the discipline included a 10-day suspension and a ban on further participation on the crew team.  The remaining allegations in the paragraph are denied.

Allegation 21.  On March 29, 2005, as a result of the incident on the crew team bus, Dr. Chase conducted another psychological evaluation of the Student. In his report of the evaluation, Dr. Chase recommended what he characterized as "more desperate measures" be taken and that the Student required placement in a "structured and therapeutic boarding school (frequently referred to as 'emotional growth schools') which specialize in academic, social, personal, and behavioral education of youths who are spiraling out of control and unable or resistant towards learning from past mistakes." Dr. Chase's report did not suggest that the Student required such a placement for educational reasons.

ANSWER:     Admitted that Dr. Chase conducted a psychological evaluation of James in March 2005, and that his later report included the language quoted in this paragraph.  The remaining allegations in the paragraph are denied.

Allegation 22. In his report, Dr. Chase quoted that [sic] Mother as stating the following:

Sadly, Tom (Jimmy's father) and I have decided that Jimmy needs major intervention to clear his head, realign his values and priorities, and give us some peace. It appears that he is not able to reject the "Bethesda (drug) culture" and has begun to intimidate me as a show of defiance. I, personally, am exhausted and no longer feel able to address his needs as a loving and patient mother. Coupled with that, Jimmy will turn 17 on June 7. Further, Tom and I are acutely aware of the limited time within which we can exercise guidance over Jimmy's choices.

ANSWER:     Admitted that Dr. Chase's report contains the quoted language.  The Pacis aver that the language has been quoted out of context and that the entire report should be read for context and meaning.

Allegation 23. As a result of the incident, the Student attended the Suburban Hospital Addiction Treatment Center's Young Adult Program.

ANSWER:     Admitted.

Allegation 24. On March 31, 2005, as a result of the March 22, 2005 incident, the Parents appealed the disciplinary action taken by the MCPS.

ANSWER:     Admitted that the Pacis appealed the disciplinary action, on or about the date contained in this paragraph. Denied that the appeal was "a result of the March 22, 2005 incident," as alleged.

Allegation 25. On April 5, 2005, an IEP team manifestation hearing was held. and the team determined that the Student's actions on March 22, 2005 were a manifestation of his disability. The ten-day suspension was rescinded, however, the expulsion from the crew team remained in place.

ANSWER:     Denied that the April 5, 2005 meeting was a "hearing," as alleged. The remaining allegations in the paragraph are admitted.

Allegation 26. At the April 5, 2005 manifestation meeting, the IEP team also decided that another IEP team meeting would be held where behavioral goals addressing social judgment would be developed and that a special pass (flash pass) would be created for the Student to use if he felt the need to leave the classroom to talk to an adult advocate.

ANSWER:     Admitted that the IEP team agreed that another IEP meeting should be held and that James would be given a flash pass. To the extent the paragraph suggests that these were the only topics at the manifestation meeting, that is denied.

Allegation 27. On April 6, 2005, a behavioral intervention plan ("BIP") was developed for the Student. The BIP implemented the recommendations of the IEP team meeting from April 5, 2005.

8

ANSWER:      Admitted that a behavioral intervention plan exists which is dated April 6, 2005.  The Pacis can neither confirm nor deny that it was developed on that date.  The remaining allegations in the paragraph are denied.

Allegation 28.  On May 6, 2005, the Student threatened his parents with a knife and made threats of suicide. As a result of this incident, the Student was admitted to the Sheppard Pratt Hospital, a psychiatric hospital, for assessment, surveillance, and treatment for homicidal ideation towards a friend, suicidal ideation and threatening his parents with a knife. He was an inpatient at the hospital from May 6, 2005 until May 16, 2005. The incident had no relationship to the Student's attendance at Whitman.

ANSWER:      Admitted that James was hospitalized at Sheppard Pratt Hospital from May 6, 2005 until May 16, 2005 for assessment, surveillance and treatment, said hospitalization deemed necessary due to various precipitating causes.   The remaining allegations in the paragraph are denied.

Allegation 29. The Student was diagnosed at Sheppard Pratt as having bipolar disorder, ADHD and substance abuse and as having antisocial traits. The bipolar diagnosis was rejected by the Student's psychiatrist, Dr. Gogtay. Upon discharge, on May 16, 2005, the Student's treating Psychiatrist recommended a "highly structured therapeutic environment which offers small classes, individualized instruction, crisis intervention, a time-out area, a behavior management plan, individual and group therapy, medication management by a psychiatrist, and an integrated treatment team approach." The Student's treating Psychiatrist did not recommend a residential placement.

ANSWER:      Admitted that Sheppard Pratt Hospital rendered several diagnoses of James and that Dr. Gogtay did not necessarily agree with all of them.  Admitted that the Sheppard Pratt Hospital discharge report contains the language quoted in the paragraph, but the Pacis aver that the language is quoted out of context and that the full report should be read for context and meaning. Admitted that the report does not specifically recommend residential placement; it does not

9

recommend any particular placement and confines itself to recommending the services and setting that would be successful for James.

Allegation 30. On May 24, 2005, the Student's Parents requested that MCPS schedule an emergency IEP team meeting so that the diagnosis of ADHD could be reevaluated and the diagnosis of emotional disturbance could be added.

ANSWER:     Admitted; however, the Pacis aver that this was only one of several similar requests they made to MCPS, all of which were ignored or deferred.

Allegation 31. On or about May 26, 2005, the Student swallowed a bottle of Robatussin [sic] cough syrup and was hospitalized for three or four days at Suburban Hospital where he participated in a [sic] addiction treatment program.

ANSWER:     Admitted that James was hospitalized at Suburban Hospital for a few days after swallowing a bottle of Robitussin cough syrup, and that he received drug treatment counseling while there.

Allegation 32. On June 6, 2005, an FBA was completed by Gayle Miller, Special Education Resource Teacher at Whitman. Ms. Miller used teacher reports, educational history, attendance reports, parent notes, IEP team meeting notes, and reports from the Student's physicians and therapists in preparing the FBA. Ms. Miller concluded that MCPS had "used interventions that we thought might work" but that none "had been successful over sustained periods of time."

ANSWER:     Admitted that Gayle Miller of Walt Whitman Senior High School, whose title is special education resource teacher, prepared a functional behavioral assessment (FBA) which she dated June 6, 2005, and that she claimed to have consulted the sources listed in the paragraph in preparing the report.  Further admitted that the FBA contains the quoted language, but the Pacis aver that the language has been taken out of context and that the entire document

should be read for full context and meaning.  The remaining allegations in the paragraph are
denied.

> Allegation 33. According to the June 7, 2005, written reports of his teachers, the
> Student participated and was motivated when he attended his classes; however, they
> found attendance and work completion to be concerns.

> ANSWER:   Admitted that James's attendance and work completion were concerns.  The

remaining allegations in the paragraph are denied.

> Allegation 34. On June 8, 2005, the Parents completed a Parent Report, indicating
> that the Student had regressed socially and emotionally over the school year, was
> making poor choices as to peers and was involved in the drug culture. The Parents
> stated:

>> We are getting a divorce. This reinforces the necessity of a
>> residential setting so that Jimmy's stability is not destroyed. Jimmy
>> has been recently diagnosed bi-polar although the full picture may
>> be more complicated especially since we know nothing of his birth-
>> father.  With his physical maturation he has intimidated me and
>> created, at times, an unsafe atmosphere.

> ANSWER:   Admitted that James's mother completed the referenced parent report, which

contains the quoted language.  The Pacis aver that the language is quoted out of context and that

the full document should be read for context and meaning.  Deny the implication that the parent

report discusses only the matters identified in this paragaph.

> 35.   As a result of the incidents involving the Student, on June 9, 2005, another
> IEP team meeting occurred for the purpose of re-evaluating the Student's
> educational status and IEP. At this meeting, the Parents indicated that the Student
> needed a residential therapeutic program and that this was supported by Dr. Chase.
> Ms. Joray, Pupil Personnel Worker, and Ms. Amick, School Psychologist, informed
> the Parents that a school level IEP team cannot place a student in a residential
> facility and that requests for private schools must be referred to the central
> individual education planning ("CIEP") team. The regular IEP team decided that

no additional assessments were required but that the assessment conducted by Dr. Chase on March 29, 2005, would be reviewed by Ms. Amick. The team agreed to meet again on July 26, 2005, at which time it would consider adding a code of emotional disturbance to the Student's IEP.

ANSWER:    Admitted that an IEP team meeting took place on June 9, 2005, at which James's possible need for a residential placement was discussed, with MCPS personnel informing the Pacis that MCPS does not place students residentially.  Further admitted that the team decided not to conduct additional new assessments, but that Ms. Amick would review Dr. Chase's most recent report, and that MCPS was unable to schedule another IEP meeting until July 26, 2005.  The remaining allegations in the paragraph are denied.

Allegation 36. On June 23, 2005, the Student enrolled at the SUWS wilderness program in Idaho. He participated in this program until August 10, 2005. While the wilderness program contained no academic component, the Parents demanded that the School Board pay for it.

ANSWER:    Admitted that James attended the SUWS wilderness program in Idaho from June 23, 2005 to August 10, 2005.  The remaining allegations in the paragraph are denied.

Allegation 37. On June 30, 2005, Marge Banville, LCSW-C, conducted an evaluation of the Student at the Parents' request. Ms. Banville recommended that the Student go directly from the wilderness program to a highly structured residential program that provided therapy during the school day, allowed for crisis intervention, had a behavior management plan, and could provide medication management. Ms. Banville did not suggest that such a placement was required for educational reasons, and that the Student:

> has exhibited extremely poor judgment with peers, and is very vulnerable to peer pressure given his poor self-concept. He has engaged with delinquent and substance abusing peers this past year, and is able to articulate the irresistible nature of his need to be accepted, even if it means acting in self-destructive ways.

ANSWER:   Admitted that Ms. Banville evaluated James, made the quoted recommendations for him and described his behaviors as indicated.  The Pacis aver that the language is quoted out of context and that the full document should be read for context and meaning.  The remaining allegations in the paragraph are denied.

Allegation 38. By a letter, dated July 22, 2005, the Student's attorney provided MCPS with both Ms. Banville's report and a report from the Student's psychologist. She did not notify MCPS that the Parents were requesting private placement.

ANSWER:   Admitted that the referenced documents were provided to MCPS as indicated.  The remaining allegations in the paragraph are denied.

Allegation 39.  On July 26, 2005, the regular IEP team met to determine whether an additional disability code (emotional disturbance) should be added to the Student's IEP, and, if so, whether goals and objectives should be added or changed. The team added a disability code of "emotional disturbance." The IEP called for the Student to be in special education classes 100% of the time and recommended placement in the emotional disturbance cluster program at Whitman on an interim basis. It made a referral to the CIEP for consideration of alternative programs. The team also determined that the Student's emotional disability precluded placement in any less restrictive environment.

ANSWER:   Admitted that an IEP team meeting took place on July 26, 2005, at which the team added the "emotional disturbance" disability code to James's IEP, revised the IEP's goals and objectives, changed his special education setting to 100% placement in special education classes, made other changes in the IEP that were deemed needed, and recommended placement in a full-time special education program in a separate setting.  Aver that because this school-based IEP team was not authorized by MCPS to place James in the separate special education setting it recommended, it proposed an interim placement in the emotional disturbance cluster program at Whitman solely because it had nothing else to offer him, and not because the team considered this placement appropriate.  Further admitted that the Whitman team referred James to the CIEP but

13

aver that this was because only that group had authority, pursuant to MCPS policy, to make a placement appropriate to James's identified needs.

> Allegation 40. At the July 26, 2005, [sic] IEP meeting, the Parents requested consideration of a placement in a private residential program for emotionally disturbed students. The team informed the Parents that the regular IEP team could not make such a decision and that such a decision had to be made by the CIEP. The Parents explained that the Student was in a wilderness program in Idaho that ended on August 11, 2005, and that they would like a program to be in place by that date.

ANSWER:     Admitted that the Pacis raised James's need for a residential placement at the July 26, 2005 IEP meeting, and that MCPS staff at that meeting responded that they were barred by MCPS policy from authorizing such a placement.  Further admitted that James's then-current placement in the SUWS wilderness program in Idaho was discussed, along with his need to make a smooth transition from that program to his next placement, including having his next placement ready to receive him when SUWS ended.  The remaining allegations in the paragraph are denied.

> Allegation 41.  On August 10, 2005, the Student completed the wilderness program in Idaho. On August 15, 2005, he started attending the residential treatment center program at Three Springs at [sic] Duck River.

ANSWER:     Admitted that James completed the SUWS program and entered the program at Three Springs of Duck River on the referenced dates.  Aver that Three Springs of Duck River includes both educational and therapeutic components, and therefore deny its characterization as a "residential treatment center."

> Allegation 42. On August 24, 2005, a CIEP team meeting occurred at which the team conducted a review and revised the Student's IEP. The meeting was chaired by George Moore, Coordinator of Placement and Assessment Services for MCPS. The Parents and their educational consultant, Michele [sic] Davis, expressed their

14

opinions that because of the Student's emotional disability, he needed a residential placement.

ANSWER:      Admitted.


Allegation 43. The MCPS members of the CIEP team recommended placement in a public separate day school and in particular at the Regional Institute for Children and Adolescents ("RICA"). Because the necessary interviews and paper work could not be completed before the start of school at RICA, the team recommended an interim placement at the Foundation school [sic]. The Parents disagreed with these recommendations.

ANSWER:      Admitted that the MCPS members of the CIEP team recommended placement in a public separate day school, for which the only available option was said to be RICA.  Aver that because MCPS does not control RICA's admissions, and because the CIEP recommendation emerged too late in August to allow James to enter its program on the first day of school even if RICA accepted him, MCPS recommended the Foundation School as an interim placement pending RICA's decision.  Further admitted that the Pacis disagreed with the MCPS team members' recommendations.  The remaining allegations in the paragraph are denied.


Allegation 44. RICA implements IEPs developed by the MCPS, and it has a residential component in which students may participate if qualified. The residential program provides a 24-hour, 7 day a week therapeutic environment for students who are unable to function in the community or at school without intensive intervention. The determination as to whether one qualifies for the residential program is made by RICA therapeutic staff and not by MCPS.

ANSWER:      The Pacis do not possess sufficient information to either admit or deny the allegations in this paragraph.  To the pleaders' knowledge, RICA implements some MCPS IEPs and provides a therapeutic environment, but no blanket statement can be made concerning the RICA/MCPS interface, nor about the environment RICA provides. The Pacis are further given to

15

understand that RICA makes admissions decisions independent of MCPS. If a response is deemed required to the remaining allegations in this paragraph, those allegations are denied.

Allegation 45.  The Foundation School is a private separate day school that provides a full day school program for students with emotional disabilities.

ANSWER:     Admitted that The Foundation School is a private separate day school for certain students with emotional disabilities.  To the pleaders' knowledge, no blanket statement about Foundation's appropriateness for all students with emotional disabilities can be made. Accordingly, if further response is required to this paragraph, the allegations contained therein are denied.

Allegation 46. On September 26, 2005, RICA denied the Student enrollment because, according to the Admissions Coordinator, based upon information provided by the Parents, he had not completed a required drug treatment program. However, the Student had in fact completed a drug treatment program both at Suburban Hospital and at the wilderness program.

ANSWER:     Admitted that on or about September 26, 2005, RICA declined to enroll James, and that the written notice of rejection stated that substance abuse issues prompted the decision.  The remaining allegations in the paragraph are denied.

Allegation 47. The Student attended Three Springs at [sic] Duck River for the 2005-2006 school year.

ANSWER:     Admitted that James attended Three Springs of Duck River for the 2005-2006 school year.  Aver that his enrollment there began before MCPS's school year started and continued past the end of MCPS's school year.

Allegation 48. On October 17, 2005, the Parents requested another CIEP meeting to discuss private residential placement.

16

ANSWER:    Admitted that on or about October 17, 2005, the Pacis requested another CIEP meeting.  Aver that the reasons offered for the meeting were to review new information and the CIEP's prior placement decision in light of RICA's rejection of James, as well to re-raise the need for residential placement.  The remaining allegations in the paragraph are denied.

Allegation 49. On December 5, 2005, a CIEP meeting was conducted, and again it was chaired by Mr. Moore. At this meeting, the Parents presented documentation from Three Springs for review. The Parents again requested placement in a private residential setting.

ANSWER:    Admitted that a CIEP meeting took place on December 5, 2005, chaired by Mr. Moore, and that additional information (including, but not limited to, documentation from Three Springs) was presented.  Aver that many topics and issues were discussed, including James's continued need for residential placement.  The remaining allegations in the paragraph are denied.

Allegation 50. On February 21, 2006, another CIEP meeting was conducted. The Parents argued that their son's emotional and educational issues could not be separated. The MCPS members of the team continued to recommend placement in a day school with an interim placement at Foundation School.

ANSWER:    Admitted that another CIEP meeting took place on February 21, 2006, at which the team members discussed James's progress at Three Springs of Duck River and his continued need for a residential placement.  Aver that the MCPS team members agreed that James required residential placement, but differed with the Pacis as to whether this placement was needed for educational or other reasons.  Further aver that MCPS changed its placement recommendation for James from "public separate day school" to "private separate day school," agreed to begin looking for an appropriate school consistent with this change, and maintained The Foundation School as an interim placement for James while the search progressed.  Admitted that the Pacis'

position at this meeting was that James's educational and other needs were intertwined and that any placement had to take this into account.  The remaining allegations in the paragraph are denied.

Allegation 51. On March 25, 2006, the Parents notified MCPS that they wanted their son to return to a [sic] MCPS school for the 2006-2007 school year, his senior year. They also expressed an interest in having their son attend the Jefferson school [sic] for the 2006-2007 school year.

ANSWER:      Admitted that on or about March 25, 2006, the Pacis notified MCPS that it appeared that James would be able to leave Three Springs of Duck River around the end of the 2005-06 school year, and that they were interested in exploring other options, including The Jefferson School.  The remaining allegations in the paragraph are denied.

Allegation 52.  The Parents included, with their March 25, 2006, [sic] letter a report from Irving M. Reti, a psychiatrist at Johns Hopkins Hospital, which described the Student's program at Three Springs at Duck River as follows:

[S]ince 08/05, the patient has been at the residential program in Tennessee, which is a highly structured environment, near to Nashville, but located out in the woods, which cost his parents around $5,000 a month. The program has both Christian and non-Christian based unites [sic], and the patient was in one of the non-Christian units. The children attend school five days a week. They are up at 6:00 a.m., attend school until lunchtime, and then have various chores in the afternoon before going to bed at 9:00 p.m. There are 11 children per group, and children ultimately graduate from the program after working their way through seven levels, corresponding to degrees of responsibility, but that also entitle them to various privileges. The patient has been at level two for sometime, although he was briefly at level three, but returned to level two after stealing another client's clothing .... The program also includes daily group meetings, and there is also individual therapy offered, although the patient has not been willing to take this up as yet. The patient describes a mixture of "fun", and "boredom" there. He enjoys the math and history classes. The program apparently does not consider him to have either major depression or bipolar disorder ....

18

ANSWER:    Admitted that the Pacis provided Dr. Reti's report to MCPS as alleged. Further admitted that Dr. Reti's report contains the quoted language.  The Pacis aver that the language is quoted out of context and that the full document should be read for context and meaning; furthermore, the report should not be used as a primary source of information about the contents of the Three Springs program nor to interpret the significance of various components of the program.  The remaining allegations in the paragraph are denied.

Allegation 53. On May 5, 2006, the CIEP team conducted another IEP meeting. Although no information was provided by the Parents with regard to how the Student's condition had changed since the February 21, 2006, [sic] CIEP meeting, the Parents stated that they felt that Foundation School was an appropriate placement.

ANSWER:    Admitted that another CIEP meeting took place on May 5, 2006, at which the Pacis stated that The Foundation School was becoming more appropriate for James with the passage of time and in light of his progress at Three Springs of Duck River, and therefore that it would be appropriate to move him to Foundation in the near future.  The remaining allegations in the paragraph are denied.

Allegation 54. [Omitted consistent with the Pacis' pending motion to strike this paragraph.]

ANSWER:    No response is required in light of the Pacis' motion to strike this paragraph.

Allegation 55. On July 11, 2006, the regular IEP team conducted an IEP team meeting for an annual review of the Student's IEP and educational status and to develop an IEP for the 2006-2007 school year.  The team again recommended that the Student be placed in a day school and in particular at the Foundation School. The Parents agreed with that placement recommendation.

ANSWER:      Admitted; however, the Pacis aver that the IEP team's recommendation was for placement in a private separate day school.

Allegation 56.  The Student attended the Foundation school [sic] for the 2006-2007 school year and he graduated in May 2007. He received academic credit for the courses he had attended at Three Springs.

ANSWER:      Admitted; however, the Pacis aver that James also received academic credit for his study at SUWS.

Allegation 57. The Student's behaviors during the 2004-2005 school year, [sic] included use of illegal drugs, association with the drug culture, assaulting his parents with a knife, threatening to kill or harm himself and others, self-injurious behavior, failing to attend school regularly, leaving school during the school day, anti-social behavior and defiant behavior.

ANSWER:      Admitted; however, the Pacis aver that the listed behaviors do not include all of the problems that were of concern during the 2004-2005 school year.

Allegation 58. The Student did not require a residential placement for the 2005-2006 school year for educational reasons.

ANSWER:      Denied.

Allegation 59. On February 13, 2007, the Parents filed their Request for Due Process Hearing seeking, *inter alia*, reimbursement for the unilateral private placement of the Student at both the SUWS wilderness program and at the Three Springs at [sic] Duck River.

ANSWER:      Admitted.

Allegation 60. A hearing was held before an administrative law judge ("ALJ") of the Maryland State Office of Administrative Hearings.

20

ANSWER:     Admitted.


Allegation 61. On August 29, 2007, the ALJ rendered his decision ordering the School Board to reimburse the Parents for the cost of the Student's tuition for Three Springs at [sic] Duck River for the 2005-2006 school year.

ANSWER:     Admitted.


Allegation 62.  The ALJ's decision contained palpable mistakes of law and fact and was contrary to the evidence for reasons including, but not limited to, the following:

> a. The ALJ ordered placement at Three Springs at [sic] Duck River for social and emotional conditions that were segrebable [sic] from the Student's educational needs.
> b. The ALJ failed to consider that the Student was making meaningful academic progress at Whitman, which was far less restrictive than Three Springs at Duck River.
> c. The ALJ failed to consider the Parents' unreasonable actions in connection with their pursuit of the IEP process.
> d. The ALJ based his decision on the assumption that the Student was entitled to a potential-maximizing education.
> e. The ALJ ordered the School Board to fund the Student's placement at Three Springs at [sic] Duck River despite the fact that it [sic] the Parents failed to establish that it offered an appropriate program in substantial compliance with the IDEIA and that it constituted the least restrictive environment.

ANSWER:     Denied.


Further answering the amended complaint, the Pacis deny all allegations not specifically admitted or otherwise answered.

## Third defense

Plaintiffs are estopped from asserting the claims made in the amended complaints by their actions and concessions during the administrative proceedings from which they have appealed.

## Fourth defense

Plaintiffs have failed to exhaust their administrative remedies.

**Wherefore,** having fully answered the amended complaint, defendants/counter-plaintiffs ask that plaintiffs/counter-defendants take nothing and that their amended complaint be dismissed with prejudice, with costs (including reasonable legal fees) to defendants/counter-plaintiffs.

## COUNTERCLAIM
*(Enforcement of portions of administrative decision/appeal from portions of administrative decision/entitlement to attorney's fees and costs)*

1.  This Court has jurisdiction over the subject matter of this counterclaim pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §1400 *et seq.* ("IDEIA") and its implementing regulations, 34 C.F.R. Part 300, as well as the grant of general federal jurisdiction found in 28 U.S.C. §1331. The Court also has jurisdiction over the subject matter of this counterclaim pursuant to 28 U.S.C. §1343. The Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. §1367.

2.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b). All counter-defendants reside in this jurisdiction and the matters with which this action is concerned took place in this judicial district.

22

3.      Counterclaims are authorized by Fed. R. Civ. P. 13(a) and (b).

4.      Defendant/counter-plaintiff James Paci ("James") resided in Montgomery County, Maryland at all times relevant to this action.

5.      Defendant/counter-plaintiff Thomas Paci ("Mr. Paci") resided in Montgomery County, Maryland at all times relevant to this action and is James's father.

6.      Defendant/counter-plaintiff Martha Donnelly ("Ms. Donnelly"), formerly known as Martha Paci, resided in Montgomery County, Maryland at all times relevant to this action and is James's mother. (References to defendants/counter-plaintiffs as a group are to "the Pacis.")

7.      Plaintiff/counter-defendant the Board of Education of Montgomery County, Maryland ("the Board") is a local education agency within the meaning of IDEIA and operates the Montgomery County Public Schools ("MCPS").

8.      Plaintiff/counter-defendant Jerry D. Weast ("Mr. Weast") is the Superintendent of MCPS and as such is charged with managing its operations and functions.

9.      Since beginning formal education, James has been diagnosed with disabling conditions that affected his ability to be educated and which therefore would have qualified him for special education had he attended public school and been properly identified as eligible by MCPS. Those conditions have at different times been identified as attention deficit hyperactivity disorder ("ADHD"), depression, bipolar disorder, learning disorder, antisocial behavior and substance abuse.

10.     James attended the Blessed Sacrament School ("Blessed Sacrament"), a private school, from kindergarten through sixth grade.  Although Blessed Sacrament is not certified as a special education facility, it provided some elements of a special education program that were helpful to him, including structure and a small student body.

11.     James attended the McLean School ("McLean"), also a private school, for the seventh through ninth grades.  Although McLean also is not certified as a special education facility, it, too, provided some of the special education elements that James required for academic success.  As he progressed through the school, however, it became increasingly clear that it no longer was appropriate for him.

12.     During James's ninth grade school year (2003-04), Mr. Paci and Ms. Donnelly commenced a search for a more appropriate school for James.  They considered, among other options, a therapeutic boarding school, but ultimately enrolled James in MCPS when no more appropriate alternative presented itself.

13.     James entered MCPS in fall 2004 for tenth grade, attending Walt Whitman Senior High School ("Whitman").  His parents, particularly Ms. Donnelly, presented all available information concerning James's educational history and special education needs to MCPS, which eventually recognized him as eligible for special education.

14.     MCPS did not formally find James eligible for special education services until October 12, 2004.  Prior to that date, he received some special education services at Whitman and was otherwise placed in general education classes.

24

15.   Prior to James's identification as eligible for special education services, he was involved in a fight at Whitman and received a two-day in-school suspension.

16.   On October 12, 2004, MCPS convened an individualized education plan ("IEP") meeting for James which, in addition to finding James eligible for special education as a student with ADHD, placed him in Whitman's learning and academic disabilities ("LAD") program.  The IEP placed James in special education classes 50% of the time, and in regular education classes 50% of the time.  The Pacis raised concerns about behavioral and social issues and asked MCPS about conducting a functional behavioral assessment ("FBA"), but were told this was unnecessary.

17.   James successfully completed his first semester at Whitman in that he passed all of his courses and engaged in socially acceptable behavior in the form of participating on Whitman's crew team.

18.   On February 17, 2005, the IEP team met to develop James's IEP for the 2005-06 school year.  The MCPS members of the team recommended removing James from all special education classes and placing him in general education classes 100% of the time.  The Pacis reluctantly accepted the recommendation, and James was thereupon placed in general education classes for all subjects.  The MCPS members of the team also determined that James was not entitled to extended school year ("ESY") services.

19.   On March 22, 2005, James was arrested, suspended from school for 10 days and removed from the Whitman crew team after he was found in possession of drug paraphernalia and a suspected controlled substance on school property.

25

20.     On April 5, 2005, an IEP team determined that James's disciplinary infraction was a manifestation of his disability and therefore, consistent with IDEIA, his suspension was rescinded.  His expulsion from the crew team remained in effect, however, pursuant to Whitman's "zero-tolerance" policy.

21.     Notwithstanding IDEIA's requirement to do so, MCPS did not develop an FBA following its determination that the disciplinary violation was a manifestation of James's disability, nor did it convene a new IEP meeting, as all agreed was then appropriate, to develop behavioral goals addressing social judgment.

22.     On April 6, 2005, MCPS developed a behavioral intervention plan ("BIP") containing recommended strategies for addressing James's increasing inappropriate behaviors.

23.     As the spring 2005 semester progressed, James's behavior both within and outside school deteriorated substantially, to the point where he rarely attended school (particularly in the last quarter of the school year), frequently engaged in uncontrollable and disruptive behavior when in the building, did not do his school work and was not earning passing grades in his courses.  James ultimately passed most of his tenth grade courses only because his grades from the first three quarters of the school year were high enough, in most cases, to balance out the failing grades he earned as time went on.

24.     James was hospitalized at Sheppard Pratt Hospital ("Sheppard Pratt") from May 6, 2005 through May 16, 2005 following reports of suicidal ideation, homicidal ideation and threats against his parents.  The staff at Sheppard Pratt diagnosed James with bipolar disorder, ADHD, substance abuse and having antisocial traits.

25.    At discharge, Sheppard Pratt recommended a

> highly structured therapeutic environment which offers small classes,
> individualized instruction, crisis intervention, a time-out area, a behavior
> management plan, individual and group therapy, medication management
> by a psychiatrist, and an integrated treatment team approach.

26.    While James was hospitalized at Sheppard Pratt, and again following his discharge, Mr. Paci and Ms. Donnelly asked MCPS to convene an emergency IEP meeting to reevaluate James's diagnosis of ADHD, consider adding the disability code of emotional disturbance to his IEP, and otherwise develop a new program for him that would take his recent deterioration and experiences into account, including placing him in a different educational environment.

27.    MCPS did not convene the requested IEP meeting until June 9, 2005.  In the interim, Mr. Paci and Ms. Donnelly undertook their own search for a more appropriate school for James. After ascertaining that there were few, if any, appropriate public options for James, they investigated private schools, both day and residential.  As time progressed, they became convinced—in consultation with the many professionals from various disciplines whom they consulted—that only a residential placement would provide the intense and integrated program that James required.

28.    Mr. Paci and Ms. Donnelly paid for the services of all consultants they engaged, including a school placement consultant who identified for them the programs in which James ultimately was enrolled in lieu of the inappropriate programs proposed for him by MCPS.

29.     On May 26, 2005, James swallowed a bottle of Robitussin cough syrup, resulting in another hospitalization, this time at Suburban Hospital.

30.     MCPS made no substantive decisions at the June 9, 2005 IEP meeting.  Instead, its representatives decided that Judith Amick, an MCPS school psychologist, would review a recent report by Dr. Robert Chase, a private psychologist who had been following James for some time, to determine whether the report was suitable for MCPS's use.  Ms. Donnelly reported at the June 9, 2005 meeting on the information she had obtained to date regarding James's future school placement options, but was told that MCPS does not place children in residential programs.  MCPS also briefly considered whether James should receive ESY services, but announced that he was not eligible.  The team agreed to meet again on July 26, 2005 to take further action as warranted.  Following the June 9, 2005 meeting, James's IEP remained unchanged, meaning that he was projected to continue in regular education classes at Whitman, 100% of the time, when he returned to school.

31.     In the absence of meaningful action by MCPS, and upon the advice of all professionals they had engaged to work with James, on June 24, 2005 Mr. Paci and Ms. Donnelly placed him in the SUWS wilderness program in Idaho.  The purpose of this placement was, among other things, to improve James's behavior, social skills and attitudes toward authority and education such that he would be able to benefit from the therapeutic educational placement he was expected to enter in fall 2005.

32.     While at SUWS, James worked on behavioral, social and organizational issues that were consistent with some of his IEP goals.  The SUWS program also has educational aspects, particularly in science and writing.

28

33.     The IEP team met again at Whitman on July 26, 2005.  The team added an emotional
        disturbance disability code to James's IEP, developed new goals and objectives for him,
        and then the MCPS members of the team determined that the least restrictive environment
        in which James could be educated was a full-time, separate special education day program.
        Because MCPS policy did not permit a school-based IEP team like Whitman's to place a
        student in such an environment, James's case was referred to MCPS's central office for
        another IEP meeting, involving different staff, which would reconsider the Whitman team's
        recommendation.   If the central IEP ("CIEP") team agreed with the Whitman
        recommendation, it would then place James in a full-time special education setting.

34.     The Pacis agreed with MCPS that James required a far more intensive educational
        environment than anything Whitman could provide, but also disagreed with the conclusion
        that a separate day program was sufficient.

35.     The Whitman team placed James in its emotional disturbance cluster program, a part-time
        special education program based at the school, on an interim basis pending the CIEP team's
        decision, although no participant in the July 26, 2005 meeting thought this was appropriate
        for James.

36.     Notwithstanding the recognized need to expedite the IEP process, MCPS did not convene
        the CIEP meeting until August 24, 2005, three business days before school was scheduled
        to resume.  At that meeting, the MCPS members of the CIEP team agreed that James
        required placement in a full-time, separate special education program for emotionally
        disturbed students, and recommended a public separate day program.  The only known
        program which fit this description was located at the John L. Gildner Regional Institute for

29

Children and Adolescents ("RICA"), which is not operated by MCPS. For that reason, MCPS can only refer a student to RICA and cannot compel the facility to accept a particular student.

37.   Because the necessary paperwork and interviews for RICA could not be completed before the fall semester started–and because James's acceptance at RICA was not assured–the CIEP team placed James, on an interim basis, at the Foundation School ("Foundation"), a private separate day school for emotionally disturbed students.

38.   Throughout the summer, Mr. Paci and Ms. Donnelly consistently maintained that James required a residential educational placement. Because MCPS consistently refused to consider such a placement, on August 15, 2005 they enrolled James in Three Springs of Duck River ("Three Springs"), a therapeutic residential program in Tennessee for boys with profiles similar to James's. James attended Three Springs throughout the 2005-06 school year.

39.   The Pacis gave timely notice to MCPS of their rejection of the IEPs developed on July 26, 2005 and August 24, 2005, and of their expectation that MCPS would fund James's private placements.

40.   RICA rejected James on September 26, 2005. Although this left James with only an interim placement proposal from MCPS, MCPS did not convene another IEP meeting until December 5, 2005, following an October 17, 2005 request from Mr. Paci and Ms. Donnelly for such a meeting.

41.     At the December 5, 2005 meeting, the CIEP team received information regarding James's program and progress at Three Springs, and discussed at length his need for a residential placement and whether this need stemmed from educational or other reasons.  The meeting ended with MCPS requesting additional information on these issues.  MCPS maintained James's interim placement at Foundation, but did not offer James a permanent educational placement.

42.     MCPS convened another CIEP meeting on February 21, 2006, at which it received additional information about Three Springs and James's progress there.  The MCPS members of that team again agreed that James required residential placement but declined to place James at Three Springs or in any other residential setting because they contended that residential placement is never required for educational purposes.

43.     At the February 21, 2006 meeting, MCPS changed James's educational placement in his IEP from "public separate day school" to "private separate day school," which allowed MCPS to begin to search for a private school that might meet James's educational needs. The interim placement at Foundation was unchanged.

44.     Following the February 21, 2006 CIEP meeting, MCPS referred James to the day programs at three private schools, some of which offered residential options.  One of the schools rejected him, noting specifically that his record supported residential placement.  One, the Jefferson School in Frederick, Maryland, accepted James upon completion of his Three Springs program, and offered to assist in finding a residential program.

31

45.    James made sufficient progress at Three Springs that it became appropriate to plan for his return to Maryland and enrollment in a day program.  Consequently, at a May 5, 2006 CIEP meeting, Mr. Paci and Ms. Donnelly agreed with MCPS that it was time to place James in a full-time separate day school.  His IEP was changed, with his parents' consent, to place him permanently at Foundation, which he entered in July 2006 upon his return from Three Springs.

46.    MCPS provided ESY services at Foundation for James during the summer of 2006, to ease his transition to that school.

47.    MCPS gave James academic credit for his year of study at Three Springs as well as for work done at SUWS.

48.    James attended Foundation through the 2006-07 school year and graduated in May 2007 with a high school diploma.

49.    On February 13, 2007, the Pacis filed a due process complaint under IDEIA in which they challenged MCPS's actions with respect to James's education while at Whitman and during the 2005-06 school.  The Pacis sought, *inter alia,* an order directing MCPS to reimburse them for all costs (including related service costs) they incurred in providing special education for James following the 2004-05 school year, and an award of the attorney's fees and other costs they incurred in pursuing their IDEIA rights.

50.     The matter was heard before an administrative law judge ("ALJ") of the Maryland Office
of Administrative Hearings.  The hearing took place on the following days: May 1-3, 2007;
June 6-7, 2007; June 11, 2007; July 17, 2007; and August 1-2, 2007.

51.     The ALJ issued his decision on August 29, 2007.  He found that MCPS had not fulfilled
its IDEIA obligations to James and that Three Springs had supplied an appropriate
education for him, from which he had obtained educational benefit.  Accordingly, the ALJ
ordered MCPS to reimburse the Pacis for the tuition costs of Three Springs for the 2005-06
school year.

52.     The ALJ found that James did not derive educational benefit from SUWS and therefore did
not award the Pacis reimbursement of the expenses associated with his placement there.

53.     The ALJ did not address the Pacis' request for reimbursement of other costs incurred
incident to James's placement at Three Springs; specifically, transportation for James and
his parents and lodging when his parents made necessary visits to the school, as well as fees
paid to the placement consultant who identified Three Springs as an appropriate option for
James.

54.     The ALJ denied the Pacis' request for attorney's fees and litigation expenses, holding that
he did not have authority to grant that request and that under IDEIA, only a district judge
can award legal fees and expenses.

33

## COUNT ONE
### *(Enforcement of administrative decision)*

55.    The allegations contained in ¶¶1-54 of this counterclaim are incorporated herein by reference and realleged as if set forth in full.

56.    The August 29, 2007 decision directed MCPS to provide proof of compliance with the corrective actions that were ordered within 30 days, or by September 28, 2007.

57.    MCPS has not complied with the decision in that it has not reimbursed the Pacis for James's Three Springs tuition, as ordered.

58.    MCPS also has not sought a stay of the August 29, 2007 decision.

59.    The Pacis are entitled to an order enforcing the August 29, 2007 and directing MCPS to reimburse them, as ordered.

## COUNT TWO
### *(Appeal of portions of administrative decision)*

60.    The allegations contained in ¶¶1-54 of this counterclaim are incorporated herein by reference and realleged as if set forth in full.

61.    Contrary to the findings and conclusions in the administrative decision, James's enrollment in the SUWS wilderness program in 2005 was appropriate to his educational needs and he derived educational benefit from that program.

62.     Due to his deterioration over the course of the 2004-05 school year and the need to ready him in all ways for the intensive therapeutic educational program he was expected to enter in fall 2005, James required ESY in 2005, which SUWS supplied following MCPS's default in its obligations to him concerning this matter.

63.     The ALJ's decision that SUWS did not provide educational benefit to James, and therefore that MCPS was not required to pay for James's participation in the SUWS program, was against the weight of the evidence and contrary to law.

64.     In order for James to benefit from the Three Springs program, he required transportation to and from the facility and his parents were required to make periodic visits.  This transportation, and the Pacis' lodging, were related services within the meaning of IDEIA such that the Pacis were entitled to be reimbursed for these costs.

65.     The ALJ erred in failing to consider the Pacis' claim for this reimbursement.  Moreover, had he addressed the issue, he would have granted the request and ordered MCPS to reimburse the Pacis consistent with their proof on this issue.

66.     Because MCPS failed to fulfill its obligation to find appropriate educational placements for James, the Pacis were forced to step into the breach and find those placements on their own.  This caused them considerable expense including, but not limited to, the fees they paid to a private educational consultant to do MCPS's work for it.

67.   At the hearing, the Pacis sought reimbursement for the fees paid to the consultant who found SUWS and Three Springs for James, but the ALJ did not consider or decide this issue.

68.   The ALJ erred in failing to consider the Pacis' claim for this reimbursement. Moreover, had he addressed the issue, he would have granted the request and ordered MCPS to reimburse the Pacis consistent with their proof on this issue.

69.   The Pacis are entitled to an order (a) reversing the August 29, 2007 decision insofar as it denied them reimbursement for the costs associated with James's participation in the SUWS program and (b) awarding them the expenses they incurred for services related to James's participation in the Three Springs program and the fees paid to the consultant who found the programs for them. Alternatively, the Pacis are entitled to an order remanding the case to the ALJ to decide the two issues that his decision did not address.

### COUNT THREE
#### *(Award of attorney's fees and expenses)*

70.   The allegations contained in ¶¶1-54 of this counterclaim are incorporated herein by reference and realleged as if set forth in full.

71.   The Pacis prevailed in the administrative proceedings within the meaning of IDEIA.

72.   As prevailing parties, they are entitled to be awarded the legal fees and expenses they reasonably incurred in vindicating their rights.

36

73.  The ALJ declined to award the Pacis their legal fees and expenses solely because he found, as a matter of law, that he lacked authority to do so.

74.  This Court has authority to award legal fees and expenses to prevailing parties in IDEIA cases, and should do so here.

75.  The Pacis are entitled to an appropriate award of legal fees and expenses from this Court.

**Wherefore,** based upon the foregoing, defendants/counter-plaintiffs demand judgment against plaintiffs/counter-defendants as follows:

A.  Entry of an order enforcing the August 29, 2007 administrative determination to the extent it ordered MCPS to reimburse the Pacis for James's Three Springs tuition;

B.  Entry of an order reversing the August 29, 2007 administrative determination to the extent it denied the Pacis' claim for reimbursement of the costs associated with James's placement in the SUWS wilderness program;

C.  Entry of an order awarding the Pacis the transportation and lodging costs related to James's placement at Three Springs and the fees they paid to find appropriate educational placements for James or, alternatively, an order remanding these issues to the ALJ for consideration and decision;

D.  An award of the costs they have incurred in pursuing their legal rights administratively and before this Court, including reasonable attorney's fees;

E.      Pre- and post-judgment interest on all sums awarded, at the maximum rate permitted by law; and

F.      Such other and further relief as the Court deems just and proper.

/s/   *Diana M. Savit*

_____

Diana M. Savit #02739
**Savit & Szymkowicz, LLP**
7315 Wisconsin Avenue
Suite 601N
Bethesda, Maryland 20814
(301) 951-9191
(301) 718-7788 (fax)
Email: dms@bowsslaw.com
Attorneys for defendants/counter-plaintiffs